# Degillio, Appellant, *v.* Board of Governance of the Pennsylvania Bar.

Argued May 26, 1942. Before SCHAFFER, C. J.; MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*E. C. Marianelli,* for appellant.

*Harry S. Knight,* for appellee.

OPINION BY MR. CHIEF JUSTICE SCHAFFER, June 29, 1942:

On complaint of the Board of Censors of the Luzerne County Bar, respondent, Nicholas R. Degillio, was cited before the Board of Governance for misconduct in his office as attorney-at-law. After hearing, the Board found that he had improperly retained a client's money after demand, and recommended that he be disbarred as provided by Section 74 of the Act of April 14, 1834, P. L. 333, 17 PS Sec. 1662, which reads: "If any such attorney shall retain money belonging to his client, after demand made by the client for the payment thereof, it shall be the duty of the court to cause the name of such attorney to be stricken from the record of attorneys, and to prevent him from prosecuting longer in the said court." From the recommendation of the Board, respondent brings to us this appeal.

Respondent, thirty-five years of age at the time of the occurrences which give rise to this proceeding, had been at the Bar for about a year and a half. He acted as counsel for Anna Musante, who was administratrix of her husband's estate. Among the assets of the estate was a policy of life insurance, in payment of which the insurance company issued a check to the order of the administratrix for $1,073.14. This check was endorsed by her to the order of the respondent, and on January 5, 1939, he deposited it in his personal account in the Liberty National Bank of Pittston. At this time his account in the bank was overdrawn in the amount of $69.22. From this account he checked out money for his own use, and for purposes other than those connected with the decedent's estate. On February 8, 1939, he had not only drawn this entire sum out, but had overdrawn the account $87.73. Subsequently and until the account was closed on November 29, 1939, he had overdrawn it thirty-seven times.

When respondent received the proceeds of the life insurance policy from the administratrix, his undertaking with her was to pay the debts of the decedent therefrom. He never paid any of the debts. When the administratrix retained him, there was some question whether she had an additional claim against the insurance company for disability payments due to her husband. Under the terms of the policy, this claim was not maintainable, and the respondent so concluded shortly after the fund came into his hands. From January 5, 1939, until the latter part of June, 1940, respondent apparently did little or nothing in connection with the affairs of the estate except to look into the question of liability for disability payments. At that time the administratrix, who lived in Virginia, called upon him and made demand for the money in his hands. He offered her the sum of $250, which she declined to receive, and he thereupon told her that he would send her a statement of the amount due to her, with a check. On July 3,

1940, he wrote her, stating that the amount of her husband's funeral bill was $553, the court costs $75, his fee $125, and costs to start the suits against the insurance companies $35, making a total of $788. He stated that the original amount received by him was $1,053.14, whereas it was $1,073.14, leaving a balance in his hands of $265.14, for which he sent her two checks drawn on the Second National Bank of Wilkes-Barre, one dated July 3rd, for $165.14, and the other post-dated to July 12th for $100. He so dated it because he did not have enough money in the bank to meet it. In this letter, he stated: "Inasmuch as some of this money is supposedly part of my fee, I am asking you to wait a week or ten days before cashing the second check, so that they will not check too closely. I am also preparing checks for the payment of the funeral bills." He did not prepare the checks or pay the funeral bills. He did not begin the two suits covered by the charge of $35. The checks which he drew to the administratrix were sent by him to her address in Virginia. She, however, had not gone to Virginia and the checks were forwarded from there to her at Wilkes-Barre. Upon receiving them, she consulted Andrew Hourigan, Esq., at that time a member of the Luzerne County Bar, who in her behalf, on July 5, 1940, made a written demand upon the respondent for the payment of the entire sum of $1,073.14. In his letter of demand, Mr. Hourigan stated that unless payment was made by Wednesday, July 10th, he would take such steps as the case demanded. On July 9th, respondent replied to Mr. Hourigan that he had sent checks to the administratrix in Virginia. On July 11th, a warrant was issued against him on complaint of the administratrix, charging him with fraudulent conversion. An indictment was drawn, on which he waived presentation to the grand jury and also his right to trial by jury. On September 25, 1940, he was tried before one of the judges of the Court of Quarter Sessions of Luzerne County, who on July 17, 1941, found him not guilty. On Septem-

ber 24th, the day before respondent's trial took place, he paid to Mr. Hourigan the amount which he had received, with interest, less $10 allowed him for expenses. At the same time he also paid the proceeds of another insurance policy which he held as guardian for a child of the decedent.

Respondent's defense was that, during the entire eighteen months in which he had the money belonging to his client in his possession, he had in a safe deposit box in the Miners Bank of Wilkes-Barre a sum of money greatly in excess of the amount which he had received, at times amounting to as much as $5,000; that on the day on which he paid the money to Mr. Hourigan it amounted to $3,000, which was in excess of the sum he had received on both life insurance policies. He kept no account of the money he claimed to have had in the safe deposit box, and no records of any kind showing whence it came, or what part of it belonged to him, and what part belonged to his clients, although he said that it represented funds of each character. He could not recall the name of any client whose money he had put in the safe deposit box. He made no satisfying explanation of why he did not pay the bills, and why, if he had this money in the safe deposit box, he did not pay it to Mr. Hourigan when he first made demand, or did not put it in bank on the day he drew the checks to the administratrix, which would have obviated the necessity to post-date one of them. He did not visit the safe deposit box from June 24th until September 24th, the day before his trial, when he says he got the money from it to pay Mr. Hourigan. His explanation of why he did not is that he feared people would think he had gone to the box for the purpose of placing money in it. Why this should be so, if the money was already there, is difficult of understanding. He could have had its presence verified by one of the attendants at the bank or by any witness asked to accompany him.

Under the facts as we have summarized them, many taken from respondent's own testimony, it is obvious, not

only that he had retained money of his client after demand for payment, but that he had converted it to his own use and, therefore, it follows that the recommendation of the Board of Governance must be approved.

The respondent, Nicholas R. Degillio, is disbarred as an attorney in this court and it is directed that his name be stricken from the record of attorneys. It is ordered that he pay the costs.